IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

---------------------------------------------------------------X

JANE DOE,

      Plaintiff,

- against –

MICHAEL KNIGHT

      Defendant.

---------------------------------------------------------------X

Civil Action No.

Plaintiff Demands a Trial by Jury

## COMPLAINT AND DEMAND FOR TRIAL BY JURY

Plaintiff, JANE DOE, (hereinafter referred to as "Plaintiff" or "DOE"), by and through Plaintiff's attorneys, DEREK SMITH LAW GROUP, PLLC, as and for Plaintiff's Complaint in this action against the Defendant Michael Knight, (hereinafter referred to as "Defendant" or "KNIGHT"), respectfully alleges as follows, upon information and belief:

## JURISDICTION AND VENUE

1. This is an action for monetary damages and all other appropriate relief as deemed by the court, pursuant to the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. §§ 1591 and 1595 ("TVPRA" or "the Sex trafficking statute"), and the Michigan state common law.

2. This Court has jurisdiction of the claims herein pursuant to 28 U.S.C. §§ 1331 and 1343, and supplemental jurisdiction thereto, as this action involves federal questions regarding deprivation of Plaintiff Doe's rights under the TVPRA.

3. Jurisdiction of this action is further conferred upon the Court as this action involves Diversity of Citizenship under 28 U.S.C. §1332.

4. Plaintiff Doe is a citizen of the State of Florida, residing in Miami-Dade County.

5. At all times material, Defendant Michael Knight is a citizen of the state of Michigan, in Oakland County.

6. Venue is proper in this district pursuant to 28 U.S.C. §1391(b) based upon the fact Defendant Michael Knight resides in and/or is located in this judicial district and a substantial part of the events or omissions giving rise to this action, including the unlawful sexual assault alleged herein occurred in this district.

## PARTIES

5. Plaintiff, Jane Doe (hereinafter also referred to as Plaintiff and "Doe") is a resident of the State of Florida, residing in Miami-Dade County.

6. At all times material, Defendant Michael Knight is a citizen of the state of Michigan, in Oakland County.

## FACTUAL BACKGROUND

7. In or around mid-2019, after a period of difficulty in her marriage, Ms. Doe and her husband separated.

8. During their separation, Ms. Doe created a personal account utilizing a dating application on her phone.

9. On or around November 30, 2019, Ms. Doe came across the profile of "Artofstrength" and proceeded to contact him directly.

10. Mr. Doe received a prompt response from the account, introducing himself as "Michael" and expressing his interest in "getting to know more about" Ms. Doe.

11. Over the course of the following two weeks, Ms. Doe and Mr. Knight spoke frequently, divulging intimate details of their personal lives and quickly building a friendship.

12. The messages on the application quickly changed to phone calls, text messages, and emails between Ms. Doe and Mr. Knight.

13. Ms. Doe openly discussed her career ambitions with Mr. Knight, explaining that while she works primarily as a psychiatric assistant for a physician in Florida, she also does work as a fashion model and a writer. The two bonded over their mutual interests, as Mr. Knight discussed openly his career as a nationally recognized "fitness guru," motivation speaker, and author.

3

14. After two weeks of talking, Mr. Knight invited Ms. Doe to Michigan, to meet his personal chefs, doctors on his "team," and his social circle. Mr. Knight and Ms. Doe discussed how this would be an incredible opportunity not just for them to connect personally but to further develop and expose her to networking resources in her industry.

15. At the time, Ms. Doe simply knew Mr. Knight based on his prominent public reputation and through his seemingly charming conduct over the course of the short relationship.

16. After much discussion, Ms. Doe agreed to visit Mr. Knight the weekend of December 13 through 15 of 2019.

17. On December 13, 2019, Ms. Doe flew from Fort Lauderdale to Detroit. Upon arrival in Detroit, Mr. Knight picked Ms. Doe up from the airport and took her to dinner and then Walgreens to pick up essentials for her hotel room.

18. Throughout the evening, Ms. Doe's impression of Mr. Knight began to change. While she still respected his professional acumen, she was increasingly disinterested in pursuing a personal romantic relationship. Throughout the evening, Ms. Doe made all efforts to remain professional with Mr. Knight and focus on developing their business relationship, while ceasing flirtation or any conduct which could be misconstrued as otherwise.

19. Following dinner, Mr. Knight drove Ms. Doe to the Hampton Inn in West Bloomsfield where she would be staying through the course of her trip. Mr. Knight proceeded to assist Ms. Doe in carrying her belongings to her hotel room once checked in.

20. After placing her bags in the room, Ms. Doe politely indicated that the evening was over and said goodnight. To her surprise, Mr. Knight attempted to kiss Ms. Doe on the lips, to which she quickly recoiled in shock.

21. Despite being aware of her discomfort and disinterest in engaging in a physical relationship, Mr. Knight continued to force himself on Ms. Doe, attempting for a second time to kiss her on the lips and touch her body.

22. Ms. Doe again pushed Mr. Knight away, this time expressly explaining she was not interested in a physical relationship, that she enjoyed their business relationship and friendship but believed it would be best for her professional development to focus on that.

23. Mr. Knight expressed his shock with her discomfort, given her visit to Michigan.

24. Ms. Doe explained kindly that she was there to socialize, see Michigan, and meet his clients and doctors, agreeing with his prior suggestions that networking is essential in the modeling business. Mr. Knight agreed to help continue to

5

"build [her] brand" and agreed that he would be a gentleman and respect her wishes. At that time, the two parted ways for the remainder of the evening.

25. On the morning of December 14, 2019, Mr. Knight met Ms. Doe at breakfast at or around 10:00AM, explaining that he was coming directly from his gym. As Ms. Doe ate, the two discussed her dietary choices and restrictions, all the while Mr. Knight offered support and guidance about meal planning and fitness.

26. During their "meal," Mr. Knight began taking photographs of Ms. Doe on his phone. Ms. Doe asked him refrain, explaining she was not dressed properly. Mr. Knight laughed off her requests to delete the images, stating words to the effect of "but you're so pretty."

27. Shortly thereafter, Mr. Knight asked Ms. Doe if she had any anti-inflammatory medication. When she stated she had medication in the room, he followed her upstairs, assisted her in further unpacking and then left.

28. At or around mid-day, Mr. Knight returned to the hotel, and began asking questions regarding Ms. Doe's modeling history. Mr. Knight asked if Ms. Doe had a modeling picture on her at that time. When Ms. Doe explained that she did not have any such photographs at that time, Mr. Knight proceeded to insist Ms. Doe pose for him to take a photo, after which the two left the hotel together.

6

29. While out together that afternoon, Mr. Knight continued to press Ms. Doe regarding her professional aspirations. First, Mr. Knight asked if he could assist Ms. Doe in providing fitness advice to improve her body. Mr. Knight proceeded to then take Ms. Doe to his gym and then on a tour of alternate business locations which he owned and/or was associated with in the area.

30. The afternoon, the two took a brief break at a local Starbucks, wherein they continued to discuss fitness, modeling, and networking opportunities which Mr. Knight could provide for Ms. Doe.

31. Mr. Knight took Ms. Doe back to her hotel around 5:00PM that afternoon, indicating he would be back shortly to take her to a Christmas Party wherein she would meet his clients and physicians with whom he worked.

32. Mr. Knight picked Ms. Doe up for the party at or around 7:00PM and escorted her to the home of his personal chef, "Reina." Upon arriving, Ms. Doe was introduced to Reina, her husband, their children, beginning to realize that the event was less for the benefit of networking and more geared to encouraging Ms. Doe to engage in a personal and/or physical relationship with Mr. Knight. In fact, Reina pressed Ms. Doe on numerous occasions that evening to engage in an intimate relationship with Mr. Knight, expressing he was a "great guy" and to "have fun." Ms. Doe explained to Reina that Mr. Knight seemed to be a

nice guy but that he was not her "type" and that they had different interests and priorities for their respective families.

33. From Reina's home, the group went to another party wherein Mr. Knight began to drink excessively and become highly intoxicated.

34. As the party began to wind down, Mr. Knight and Ms. Doe left so that Ms. Doe could return to her hotel, assuming the evening was over. While in the car, Ms. Doe received an unexpected and ominous text message from Reina stating, "Have fun." Ms. Doe was caught off guard and began to question what Reina meant with her message. Despite feeling as though something bad was about to happen, Ms. Doe brushed off the feeling, minimizing it as fleeting thoughts in her head and justifying to herself that Reina was intoxicated as well.

35. Prior to arriving at the hotel, Mr. Knight and Ms. Doe agreed they were both hungry and stopped to get a bite to eat at "Prime 29." Mr. Knight explained he wanted to "celebrate [her] last night" and ordered champagne. The two talked briefly as they snacked and left for the hotel shortly thereafter.

36. At or around 11:00PM, the two arrived back at the hotel. Ms. Doe attempted to leave Mr. Knight's car without incident, but he became agitated and insisted he needed to simply "lay down" before he continued to drive home. Uncomfortable with him being in her room but equally concerned about him driving while intoxicated, Ms. Doe reluctantly agreed.

37. Immediately upon entering the room, Mr. Knight passed out in Ms. Doe's bed. Ms. Doe was relieved and began to pack her belongings in advance of her flight the next morning. Ms. Doe kept to herself as Mr. Knight slept, piling her clothing neatly on the bed away from him.

38. Unbeknownst to Ms. Doe, as she was gathering her items from the bathroom, Mr. Knight had awoken and was walking towards the table to turn off the light.

39. Expecting that he was leaving the room, Ms. Doe turned around to say goodbye.

40. Instead, Mr. Knight began to attack Ms. Doe, forcibly grabbing at her body and tearing off her thermals and underwear.

41. The sheer force caused Ms. Doe to lose her balance and stumble to the side of the bed. As she fell backwards, she began insisting Mr. Knight stop, exclaiming repeatedly, "What are you doing?"

42. Mr. Knight refused to respond, instead escalating the assault. Mr. Knight held Ms. Doe's legs above her head and began to perform oral sex on Ms. Doe while vaginally penetrating her with his fingers.

43. Ms. Doe attempted to free herself of Mr. Knight's grasp all the while screaming that he stop and let her go.

44. Mr. Knight refused to stop, all the while appearing target focused on causing her the most pain and humiliation possible.

9

45. Mr. Knight then proceeded to unzip his pants, remove his erect penis and penetrate Ms. Doe vaginally. The sheer force of Mr. Knight's assault caused Ms. Doe to tear and bleed.

46. Ultimately, dismayed by Ms. Doe's fight and no longer enjoying the pain he was causing her, Mr. Knight stopped and abruptly left the room.

47. As soon as Mr. Knight left, Ms. Doe ran to the bathroom and began scrubbing and washing every part of her body, somehow convincing herself that if she washed herself enough, it would be as though it never happened. Despite her best efforts, including dousing herself in witch hazel and rubbing alcohol.

48. Unable to get the reoccurring thought of Mr. Knight laying on top of her out of her head, Ms. Doe called Mr. Knight. Ms. Doe screamed at Mr. Knight exclaiming he attacked her, caused her pain, and made her bleed. Mr. Knight reluctantly apologized, seemingly mocking Ms. Doe insisting he would "never do that again."

49. As Ms. Doe laid in bed thinking of what occurred, unable to sleep, she struggled with the decision of whether to call the local police and report the assault. Ultimately, Ms. Doe panicked, deciding that she already felt alone in a city where she knew no-one independent of her relationship with Mr. Knight. Ms. Doe ultimately decided to wait until she was safely back in Florida and would then begin the process of reporting the attack.

50. The following morning, having barely slept, Ms. Doe prepared to leave for the airport and went downstairs to eat breakfast.

51. At or around 10:00AM, Ms. Doe went back upstairs to shower and finish gathering her belongings.

52. While packing, Ms. Doe heard a knock at the door. Upon opening the door, Ms. Doe was confronted by Mr. Knight. Mr. Knight insisted he was there to sell Ms. Doe his dog, in an effort to appease Ms. Doe and remedy the attack from the night before. When Ms. Doe expressed her disinterest, Mr. Knight began to threaten Ms. Doe, insisting that if she told anyone what happened she wouldn't make it home and her reputation would be ruined.

53. Mr. Knight then proceeded to take his dog and leave.

54. Ms. Doe was horrified by the threats. Ms. Doe knew full and well what Mr. Knight was capable of after being attacked by him the night prior and felt his threats were all but guaranteed.

55. As Ms. Doe continued to gather her things from the bathroom, she heard a second knock at the door. When she asked who it was, no on responded.

56. As she exited the bathroom, Mr. Knight opened the door and let himself into her room. Ms. Doe insisted she was changing and undressed, demanding that he leave immediately.

57. Despite her insistence that he leave, Mr. Knight entered the room.

58. Ms. Doe began to yell, again insisting she was undressed and that he must leave. Mr. Knight laughed her off, stating "Well I already did."

59. Ms. Doe ran to the bathroom and locked herself in there, hoping he would leave. Once dressed, she left the bathroom to find Mr. Knight sitting on the couch, clearly angered by being rejected.

60. Mr. Knight threatened Ms. Doe for a second time, and this time including threats against her family. Mr. Knight stated, "Be nice or I'll ruin you."

61. Ms. Doe attempted to calm herself, focusing entirely on getting to the airport and leaving Michigan.

62. Mr. Knight insisted on driving Ms. Doe to the airport. During their ride, Mr. Knight made multiple stops and attempted make small talk to no avail. Mr. Knight seemed to backtrack for his conduct, repeatedly stating he apologized and that he was "clean."

63. Upon arriving at the airport, Mr. Knight attempted to hug Ms. Doe. When she rebuffed his hug, he again switched personalities, threatening her, her family, and her career. Mr. Knight capped his threats, "promising" Ms. Doe he would soon visit South Florida to visit her.

64. In the days that followed her return to Florida, Ms. Doe met with physicians at urgent care as well as her own personal physicians. Ms. Doe was terrified by

Mr. Knight's "assurances" of being "clean," immediately seeking confirmation through his medical records and her own STD testing.

65. Mr. Knight continued insisting he would be visiting South Florida to "settle what [he] had done."

66. On or around December 17, 2019, Ms. Doe ultimately made the decision to file a police report and informed Mr. Knight of such in an effort to deter his continued communication. Unsurprisingly, Mr. Knight repeated his threats against Ms. Doe.

67. As a result of Defendant Knight's outrageous and unspeakable conduct, Plaintiff Doe was caused to sustain serious and permanent personal injuries, including permanent psychological injuries, in addition to severe emotional distress.

68. As a result of Defendant's actions, Plaintiff felt and continues to feel extremely humiliated, degraded, victimized, and embarrassed.

69. Plaintiff Doe suffers from regular panic attacks and nightmares relating to Defendant's conduct.

70. As a result of the acts and conduct complained of herein, Plaintiff Doe has suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

71. As Defendant Knight's conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands Punitive Damages as against Defendant Knight.

72. The above are just some examples, of some of the unlawful conduct and comments to which Defendant Knight subjected Plaintiff Doe.

### COUNT ONE
### Cause of Action for Sex Trafficking by Force and/or Coercion

73. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

74. Plaintiff brings this claim pursuant to all applicable sections of 18 U.S.C.A. §§ 1591, 1595 in that "An individual who is a victim of a violation of Section 1589, 1590, or 1591 of title 18, United States Code, may bring a civil action in any appropriate district court of the United States. The court may award actual damages, punitive damages, reasonable attorneys' fees, and other litigation costs reasonably incurred." 18 U.S.C.A. §1595(a).

75. 18 U.S.C. 1591, entitled "Sex trafficking of children or by force, fraud, or coercion," states:

   a. Whoever knowingly—
   
      i. in or affecting interstate or foreign commerce […] recruits, entices, harbors, transports, provides, obtains, advertises, maintains,

14

      patronizes, or solicits by any means a person; or

    ii. benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1)

b. knowing, […] that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act […].

c. The term "coercion" means—

    i. threats of serious harm to or physical restraint against any person;

    ii. any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or

    iii. the abuse or threatened abuse of law or the legal process.

d. The term "commercial sex act" means any sex act, on account of which anything of value is given to or received by any person.

e. The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial

sexual activity in order to avoid incurring that harm.

7. 18 U.S.C. 1591 § (e)(3) defines a "commercial sex act" as "any sex act, on account of which anything of value is given to or received by any person."

8. Defendant KNIGHT knowingly, in or affecting interstate and foreign commerce, solicited, recruited, enticed, harbored and/or obtained Plaintiff DOE knowing the fact that his means of force, threats of force, and coercion would be used to cause Plaintiff DOE to engage in a commercial sex act.

9. Defendant KNIGHT violated the sections cited hereto and Plaintiff DOE suffered damage as a result.

## COUNT TWO
## Cause of Action for Sexual Assault and Battery

10. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

11. That Defendant KNIGHT sexually assaulted and battered Plaintiff Doe in or around December 2019 as set forth above.

12. Defendant KNIGHT engaged in illegal and improper touching of Plaintiff DOE, against her will and without her consent.

13. Defendant KNIGHT forcibly placed his tongue in Plaintiff DOE's vagina, against her will and without her consent.

14. Defendant KNIGHT forcibly placed his fingers in Plaintiff DOE's vagina, against her will and without her consent.

15. Defendant KNIGHT forcibly rubbed his erect penis inside Plaintiff DOE's vagina, against her will and without her consent.

16. As a result of Defendant KNIGHT'S assaults and batteries, Plaintiff DOE suffered serious and permanent injuries as set forth above.

17. Defendants violated the sections cited hereto and Plaintiff suffered damage as a result.

## COUNT THREE
## Cause of action for False Imprisonment

18. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

19. To state a claim for false imprisonment, a plaintiff must show: (1) an unlawful detention and deprivation of the liberty of a person, (2) against that person's will, (3) without legal authority or color of authority, and (4) which is unreasonable and unwarranted under the circumstances.

20. In or around December of 2019, Defendant Knight willfully acted intending to confine Plaintiff without her consent and without authority of law, causing unreasonable and unwarranted confinement under the circumstances.

21. Defendant Knight intentionally and unlawfully detained and deprived Plaintiff of her liberty by confining Plaintiff inside her hotel room.

22. Plaintiff was aware of her own confinement as she was forcibly assaulted and battered, held down by Defendant Knight against the bed.

17

23. Defendant Knight did not have authority by consent or authority of law or even under color of authority.

24. Defendant Knight' confinement of Plaintiff was unreasonable and unwarranted under the circumstances.

25. As a direct and proximate result of Defendant Knight' false imprisonment on Plaintiff, Plaintiff has suffered and will continue to suffer severe and permanent traumatic injuries, including mental, physiological, and emotional damages.

26. Plaintiff has suffered because of the above-described misconduct perpetrated by Defendant.

## COUNT FOUR
## A Cause of Action for intentional Infliction of Emotional Distress

27. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

28. To establish a claim of intentional infliction of emotional distress, the plaintiff must present evidence of: (1) the defendant's extreme and outrageous conduct, (2) the defendant's intent or recklessness, (3) causation, and (4) the severe emotional distress of the plaintiff." *Walsh v. Taylor*, 263 Mich. App. 618, 634 (2004) (citation omitted).

29. The conduct of the Defendant was intentional, personal in nature, retaliatory, extreme and outrageous so as to go beyond all possible bounds of decency.

18

30. Such intentional, extreme and outrageous conduct caused Plaintiff to suffer humiliation, extreme embarrassment, fear for her well-being and safety, and other severe emotional distress and damages.

31. As a result of Defendant KNIGHT's assaults and batteries, Plaintiff suffered serious and permanent injuries as set forth above.

32. Defendants violated the sections cited hereto and Plaintiff suffered damage as a result.

## JURY DEMAND

Plaintiff Doe requests a jury trial on all issues to be tried.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Doe demands judgment against Defendant Knight, jointly and severally, in an amount to be determined at the time of trial plus interest, including, but not limited to, all compensatory damages, emotional distress, punitive damages, liquidated damages, statutory damages, attorneys' fees, costs, and disbursements of action; and for such other relief as the Court deems just and proper.

                                          CROSON, TAUB, & MICHAELS, PLLC

                                          /s/*Charlotte Croson*
                                          Charlotte Croson, Esquire
                                          *Attorneys for Plaintiff*
                                          455 E. Eisenhower Parkway, Ste. 75
                                          Ann Arbor, Michigan 48108
                                          P: (734) 519-0872
                                          E: CCroson@ctmlawyers.com

Date:   December 10, 2021