UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JANE DOE,

    Plaintiff,

v.

                                                Civil Case No. 21-12892
                                               Honorable Linda. V. Parker

MICHAEL KNIGHT,

    Defendant.
_____/

## OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS (ECF NO. 9)

On December 10, 2021, Plaintiff initiated this lawsuit against Michael Knight ("Defendant"), asserting a federal claim under 18 U.S.C. § 1591 and 1595, also known as the Trafficking Victims Protection Reauthorization Act ("TVPA") (Count I), and several state law claims of sexual assault and battery (Count II), false imprisonment (Count III), and intentional infliction of emotional distress (Count IV). (ECF No. 1.) On January 11, 2022, Defendant filed a Motion to Dismiss. (ECF No. 4.) Plaintiff filed an Amended Complaint on February 1, 2022, as a matter of course under Federal Rule of Civil Procedure 15. (ECF No. 7.) Accordingly, the Court dismissed Defendant's motion as moot. (ECF No. 8.)

The matter is presently before the Court on Defendant's Motion to Dismiss the Amended Complaint. (ECF No. 9.) On March 8, 2022, Plaintiff filed a

response. (ECF No. 12.) Finding the facts and legal arguments sufficiently presented in the parties' briefs, the Court is dispensing with oral argument with respect to the motion. E.D. Mich. LR 7.1(f). For the reasons that follow, the Court denies Defendant's motion to dismiss.

I. **Standard of Review – Motion to Dismiss**

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the complaint. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996). Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." To survive a motion to dismiss, a complaint need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action . . .." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint does not "suffice if it tenders 'naked assertions' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557).

As the Supreme Court provided in *Iqbal* and *Twombly*, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id*. (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is

2

liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). The plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Twombly*, 550 U.S. at 556.

In deciding whether the plaintiff has set forth a "plausible" claim, the court must accept the factual allegations in the complaint as true. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). This presumption is not applicable to legal conclusions, however. *Iqbal*, 556 U.S. at 668. Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. (citing *Twombly*, 550 U.S. at 555).

**II.    Factual Background**

In 2019, Plaintiff created an account on a dating application on her phone. (Am. Compl. ¶ 8, ECF No. 7 at Pg ID 47.) In November of 2019, while using the dating application she came across the profile "Artofstrength" and contacted him directly. (*Id*. ¶ 9.) Plaintiff received a response from the account, introducing himself as "Michael" and the two spent the next two weeks building a friendship, "divulging intimate details of their personal lives and quickly building a friendship." (*Id*. ¶¶ 11, 12.)

The two bonded over their mutual interests as Defendant discussed "his career as a nationally recognized 'fitness guru,' motivational speaker, and author."

(*Id.* ¶ 13.) Defendant invited Plaintiff to Michigan to grow their connection and "to further develop and expose her to networking resources in the industry." (*Id.* ¶ 14, Pg ID 47-48.) Plaintiff was to meet Defendant's "chefs, doctors on his 'team,' and his social circle." (*Id.*) In the "influencer" and fitness community, it is understood that your network is what drives your success. (*Id.* ¶ 17, Pg ID 48.) As such, on December 13, 2019, Plaintiff flew to Michigan to meet Defendant for the weekend. (*Id.* ¶ 20.)

Upon Plaintiff's arrival, Defendant picked her up from the airport, and the two went to dinner. (*Id.*) Throughout the evening, Plaintiff became increasingly disinterested in pursuing a romantic relationship with Defendant and made a conscious effort to remain professional in developing their business relationship. (*Id.* ¶ 21, Pg ID 49.) At the end of the evening, Defendant drove Plaintiff to her hotel and helped her bring her belongings to her room. (*Id.* ¶ 22.) Plaintiff politely bade Defendant goodnight when to her surprise, he attempted to kiss her on the lips. (*Id.* ¶ 23.) Despite Plaintiff recoiling in shock, Defendant made a second attempt to touch her body and kiss her on the lips. (*Id.* ¶¶ 23, 24.) At that point, Plaintiff again pushed Defendant away and indicated she was only interested in pursuing a professional relationship with him. (*Id.* ¶ 25.) Defendant expressed he was shocked at this news, given Plaintiff's trip to Michigan. (*Id.* ¶ 26, Pg ID 50.) Plaintiff again reiterated she was only interested in expanding her network, just as

he had suggested she do in their prior communications. (*Id.* ¶ 27.) Defendant indicated he understood and would still assist her in "building her brand." (*Id.*)

The next day while Plaintiff and Defendant were eating and conversing, Defendant "offered support and guidance about meal planning and fitness." (*Id.* ¶ 28.) Defendant then proceeded to take Plaintiff to his gym and tour other businesses he owned. (*Id.* ¶ 33, Pg ID 51.) The two stopped at a local coffee shop and continued to discuss fitness, modeling, and networking opportunities that Defendant could provide for Plaintiff. (*Id.* ¶ 34.) Amid these conversations, however, Defendant made flirtatious comments and sexual advances that disoriented Plaintiff. (*Id.* ¶ 36, Pg ID 52.)

The two attended a Christmas party, at Defendant's personal chef's home in the evening. (*Id.* ¶ 38.) The party was meant to be a networking event for Plaintiff so she could meet members of Defendant's team. (*Id.*) However, when Plaintiff and Defendant arrived at the party, it became clear that this event was less for professional development and more to encourage Plaintiff to pursue a romantic relationship with Defendant. (*Id.*) At numerous points in the evening, Defendant's chef encouraged Plaintiff to engage in an intimate relationship with Defendant. (*Id.*) Plaintiff responded that she was not interested in pursuing anything romantic with Defendant. (*Id.*)

After the Christmas party, Plaintiff and Defendant attended another party together where Defendant became highly intoxicated. (*Id.* ¶ 39, Pg ID 53.) At the end of the evening, Defendant drove Plaintiff to her hotel, during which time Plaintiff received a text from Defendant's chef stating, "have fun." (*Id.* ¶ 40.)

When they arrived at the hotel, Plaintiff attempted to leave Defendant's "car without incident, but he became agitated and insisted he needed to simply 'lay down' before he continued to drive home." (*Id.* ¶ 42.) Plaintiff was uncomfortable with the idea of Defendant in her room, but she reluctantly agreed. (*Id.*) Upon entering the room, Defendant passed out immediately on Plaintiff's bed. (*Id.* ¶ 43.) While Plaintiff was collecting her belongings in the bathroom, Defendant got up to turn off the light. (*Id.* ¶ 44, Pg ID 54.) She expected that he was leaving the room and turned to say goodnight, but instead, Defendant attacked her. (*Id.* ¶ 46.)

Despite Plaintiff's indications that she was unwilling to engage in sexual acts with Defendant before and during this incident, Defendant performed oral sex on Plaintiff and forcibly penetrated her with his fingers and penis. (*Id.* ¶¶ 47-51, Pg ID 54-55.) Plaintiff was horrified by this attack and resolved to call the relevant authorities when she returned home to Florida. (*Id.* ¶ 55, Pg ID 55.)

The following day, Defendant returned to Plaintiff's rooms and insisted he was there to make amends for the prior evening, to which she responded she was not interested. (*Id.* ¶ 58, Pg ID 56.) Before leaving, Defendant asserted that if

6

Plaintiff told anyone about the prior evening, she would not make it home, and he would ruin her reputation. (*Id.* ¶¶ 58, 69 Pg ID 56, 57.) Defendant then insisted that he drive Plaintiff to the airport, which she allowed, during which Defendant repeatedly apologized, stating that he was "clean." (*Id.* ¶ 71, Pg ID 57-58.) Upon arrival at the airport, Defendant attempted to hug Plaintiff, which she rebuffed. (*Id.* ¶ 72, Pg ID 58.) Defendant then threatened her, her family, and her career, promising that he would make a trip to Florida to visit her soon. (*Id.*)

When Plaintiff arrived back in Florida, she immediately underwent STD testing. (*Id.* ¶ 74.) She also received more assurances from Defendant that he would visit Florida to "settle what [he] had done." (*Id.*) By this point, there was no more discussion of her career, nor did Plaintiff hear from anyone she met on the trip regarding professional development. (*Id.* ¶ 75.) On or around December 17, 2019, Plaintiff filed a police report. (*Id.* ¶ 76.)

### III.  Arguments and Analysis

#### A.  Violation of the TVPA

Plaintiff claims that Defendant violated 18 U.S.C. § 1591 of the TVPA and is therefore civilly liable under 18 U.S.C. § 1595. (Am. Compl. ¶ 85, ECF No. 7 at Pg ID 60.) Section 1591 titled "Sex Trafficking of Children or by Force, Fraud, or Coercion" states:

> (a) Whoever knowingly—

> (1) . . . recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or
>
> (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),
>
>> knowing, or ... in reckless disregard of the fact, that means of force, threats of force, fraud, coercion ... or any combination of such means will be used to cause the person to engage in a commercial sex act…shall be punished as provided in subsection (b).

18 U.S.C. § 1591(a); *see also United States v. Afyare*, 632 F. App'x 272, 275 (6th Cir. 2016) (Finding that the TVPA also applies to adults.)

Put simply, to succeed on a claim under 18 U.S.C. § 1591, Plaintiff must show that Defendant "(1) recruited, enticed, harbored, transported, provided, obtained, or maintained a person; (2) knowing that force, threats of force, coercion, or any combination of such means would be used; (3) to cause the person to engage in a commercial sex act." *United States v. Bixler*, 2022 WL 247740, at *7 (6th Cir. Jan. 27, 2022); *Noble v. Weinstein*, 335 F. Supp. 3d 504, 515 (S.D.N.Y. 2018). Section 1591 defines commercial sex act as "any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(e)(3).

Plaintiff asserts that Defendant "knowingly . . . solicited, recruited, enticed, harbored and/or obtained Plaintiff knowing the fact that his means of force, threats

8

of force, and coercion would be used to cause Plaintiff to engage in a commercial sex act." (Am. Compl., ECF No. 7 at Pg ID 61.) She, therefore, claims that Defendant is liable under 18 U.S.C. § 1595, which states:

> (a) An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

18 U.S.C. § 1595. "Section 1595 of [TVPA] 'provides trafficking victims with a private right of action to pursue claims against perpetrators of trafficking ("direct liability") or those who knowingly benefit financially from trafficking ("beneficiary liability").'" *Vargasan v. MG Freesites, Ltd.*, No. 4:22-CV-P47-JHM, 2022 WL 1414491, at *6 (W.D. Ky. May 4, 2022) (citing *Doe v. Mindgeek USA Inc.*, 558 F. Supp. 3d 828 (C.D. Cal.), *adhered to on denial of reconsideration*, 574 F. Supp. 3d 760 (C.D. Cal. 2021)).

Defendant argues for dismissal stating that Plaintiff's TVPA claim should be dismissed because nothing of value was given to either Plaintiff or Defendant, and thus no commercial sex act occurred. (ECF No. 9 Pg ID 77.) Defendant states that there are no factual allegations to support the notion that he "sought to 'prostitute' Plaintiff in some fashion, or traffic her in a sexual manner for commercial gain or profit." (ECF No. 9 Pg ID 77). Defendant additionally asserts that the "alleged

9

discussions about fitness, modeling, and marketing . . . [do not] constitute the commercial gain or profit required to establish a claim for sex trafficking." (ECF No. 9 at Pg ID 77). As such, the Court will only address what "value" encompasses and the term "commercial sex act" within the meaning of this statute. The Sixth Circuit has not directly addressed the issue of what constitutes "value" within the context of the TVPA. However, this Court may look to other districts for guidance.

Until recently, the TVPA largely only prosecuted archetypal sex trafficking cases (i.e. torture, child prostitution, child pornography). *See Noble*, 335 F. Supp. 3d at 515, n.4. Since the "#MeToo" movement gained momentum courts in other districts began to look at the statute and, more specifically, the meaning of "value" more broadly. *See Ardolf v. Weber*, 332 F.R.D. 467, 473 (S.D.N.Y. 2019) ("since the rise of the #MeToo movement, victims of 'casting couch' sexual abuse and assault increasingly rely on the TVPA to prosecute alleged perpetrators such as Hollywood movie mogul Harvey Weinstein.") This logically follows, as "Congress's use of expansive language in defining commercial sex act—using such terms as 'any sex act,' 'anything of value,' 'given to or received by any person'-requires a liberal reading." *Noble*, 335 F. Supp. 3d at 521 (citing *United States v. Maneri*, 353 F.3d 165, 168 (2d Cir. 2003).) As such, district courts now have been found to hold that pledges of career advancement qualify as "things of

10

value" for the purposes of the TVPA, even if the promise is never actually fulfilled. *See e.g.*, *Eckhart v. Fox News Network*, LLC, 2021 WL 4124616, at *9 (S.D.N.Y. Sept. 9, 2021) (finding plaintiff had alleged a claim under the TVPA where defendant offered to help advance her career by introducing her to powerful people in the industry and a promise to appear on air on national television.)

On numerous occasions, the district courts in New York found that the TVPA does in fact cover allegations of sexual assault being commercial in nature by way of potential career advancement. *See David v. Weinstein Co. LLC*, 431 F. Supp. 3d 290, 303 (S.D.N.Y. 2019) (finding a commercial sex act where "[p]laintiff, an aspiring actress, received meetings—private meetings—with one of the most influential producers in her industry, as well as opportunities for potential movie and television roles based on her contact with him."); *Ardolf v. Weber*, 332 F.R.D. 467, 478 (S.D.N.Y. 2019) (finding a commercial sex act where a plaintiff's alleged career advancement included future modeling jobs); *Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 168 (S.D.N.Y. 2019) (holding that "TVPA extends to [the] enticement of victims by means of fraudulent promises of career advancement, for the purpose of engaging them in consensual or, as alleged here, non-consensual sexual activity."); *Canosa v. Ziff*, 2019 WL 498865, at *22 n. 26 (S.D.N.Y. Jan. 28, 2019) (finding a "commercial sex act" includes receiving something of value such as career advancement in exchange for participating in

11

coerced sexual activity); *Noble*, 335 F. Supp. 3d at 521 (finding "the expectation of a film role, of a modeling meeting, of 'his people' being 'in touch with her' had no value—does not reflect modern reality.").

In *Huett v. Weinstein Co. LLC*, the court held that promises of career advancement for sex could be likened to the provision of drugs daily in exchange for sex, which the Ninth Circuit previously held as "value" in terms of the TVPA statute. 2018 WL 6314159, at *3 (C.D. Cal. Nov. 5, 2018). The court noted that "neither is 'commercial' in the sense of involving a payment; rather, they involve nonmonetary (even if quantifiable) benefits." *Id*. This idea was similarly applied in *U.S. v. Rivera.*, 2012 WL 6589526, at *5 (M.D. Fla. Dec. 18, 2012), *aff'd*, 551 F. App'x 531 (11th Cir. 2014), where the defendant promised the plaintiff, who was a minor, that she would be ordained a prophet to coerce her into sexual acts. The Defendant asserted that nothing of value was given or received and thus no commercial sex act occurred. *Id*. However, the court ruled that "[w]hile ordination as a prophet is an intangible, rather than a tangible thing of monetary value, the term 'anything of value' encompasses more than just monetary gain . . . ." and thus a commercial sex act occurred. *Id*.

Here, Plaintiff flew from Florida to Michigan with the notion that she would potentially be developing a romantic relationship with Defendant and advancing her career via his connections and expertise in modeling and fitness. Defendant

12

asserts that the Complaint does not indicate that Plaintiff flew down to meet Defendant for anything other than personal reasons. (ECF No. 9 at Pg ID 77.) However, Plaintiff alleges that the purpose of this trip was for Plaintiff to develop both a personal *and* business relationship with Defendant. Plaintiff alleges that Defendant invited her to Michigan, "to meet his personal chefs, doctors on his 'team,' and his social circle." (Am. Compl. ¶ 14, ECF No. 7 at Pg ID 47.) Plaintiff and Defendant "discussed how this would be an incredible opportunity not just for them to connect personally but to further develop and expose her to networking resources within the industry." (*Id.*) This sentiment is further expressed throughout the complaint. (*Id.* ¶¶ 27-29, 33-35, Pg. ID 50, 51.) Therefore, Plaintiff alleges that the "value" given was career advancement, and thus the assault was commercial in nature.

Further, even though Plaintiff initially entertained the idea of a personal relationship with Defendant, relevant case law has determined that consent does not exist in perpetuity and can be withdrawn at any point. In *Eckhart*, the defendant sought to dismiss the plaintiff's TVPA claim because they had an alleged consensual sexual relationship in the past. 2021 WL 4124616, at *8. The court held that "[a] person may engage in sexual activity with the same person due to enticement on one occasion and absent any enticement on another; the [c]ourt sees no basis to conclude that every sexual encounter between parties must fall

13

under the TVPA in order for a plaintiff to have such a claim." *Id*. Applying this notion to the facts of the case before the Court today, Plaintiff has sufficiently alleged that she made clear to Defendant that she did not consent to sexual advances from him well before the alleged assault. (Am. Compl. ¶ 25, ECF No. 7 at Pg ID 49.) Importantly, Plaintiff also asserts that even when she felt uneasy about Defendant, his promise of career advancement motivated her to continue working on their business relationship. (*Id*. ¶ 37, Pg ID 52.)

Plaintiff has alleged that a commercial sex act did occur. As such, the Court denies Defendant's Motion to Dismiss as it pertains to Count I of the Amended Complaint.

### B. Plaintiff's Intentional Infliction of Emotional Distress Claim (Count IV)

Plaintiff asserts the state law claims of sexual assault and battery, false imprisonment, and intentional infliction of emotional distress against Defendant. In the motion to dismiss, Defendant only requests dismissal of the intentional infliction of emotional distress claim (Count IV). (*See* ECF No. 9 Pg ID 70.) As such, the Court will not address the merits of the remaining claims.

Nevertheless, Defendant fails to articulate any reasoning as to how Plaintiff fails to state a claim for intentional infliction of emotional distress. Accordingly, this argument is waived. *Gen. Star Nat'l Ins. Co. v. Administratia Asigurarilor de*

*Stat*, 289 F.3d 434, 441 (6th Cir. 2002) (observing that "perfunctory and undeveloped arguments" are waived); *Slater v. Potter*, 28 F. App'x 512, 513 (6th Cir. 2002) (citing *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996)) (indicating that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

Yet, even if Defendant is not deemed to have abandoned this argument the Court finds that Plaintiff has sufficiently alleged this claim. In Michigan "[t]o establish a prima facie claim of intentional infliction of emotional distress, the plaintiff must present evidence of (1) the defendant's extreme and outrageous conduct, (2) the defendant's intent or recklessness, (3) causation, and (4) the severe emotional distress of the plaintiff." *Lucas v. Awaad*, 830 N.W.2d 141, 150 (Mich. App. 2013) (quoting *Dalley v. Dykema Gossett PLLC*, 788 N.W.2d 679 (Mich. App. 2010). Plaintiff alleges that because of Defendant's intentional conduct, she has suffered severe emotional distress, permanent psychological injuries, regular panic attacks, nightmares relating to his conduct, and feeling humiliated, victimized, and embarrassed. (Am. Compl. ¶ 77-79, ECF No. 7 at Pg ID 59.) As such, the Court denies Defendant's motion to dismiss as it pertains to Count IV of the Amended Complaint.

Accordingly,

**IT IS ORDERED** that Defendant's motion to dismiss (ECF No. 9) is **DENIED**.

**IT IS SO ORDERED.**

                                                 s/ Linda V. Parker
                                                 LINDA V. PARKER
                                                 U.S. DISTRICT JUDGE

Dated: August 26, 2022